DAVIS, Chief Judge.
Frederick Smith challenges the trial court’s final judgment in favor of Geico Casualty Company in Mr. Smith’s uninsured motorist action against the insurer. The trial court’s final judgment was based on a jury verdict by which the jury awarded Mr. Smith past medical damages but denied him future medical expenses. We affirm the final judgment but write to address two evidentiary issues.
Mr. Smith was a passenger on a public bus when the bus was involved in an accident with another vehicle. Mr. Smith alleges that as a result of the accident, he received injuries to his back requiring extensive treatment and multiple surgeries. Mr. Smith filed a cause of action against the driver of the other vehicle and Geico as his underinsured motorist carrier. In his complaint, he claimed that he had incurred a permanent physical injury, had $250,000 in past medical expenses, and was entitled to an award of future medical expenses. Geico argued below that Mr. Smith had a prior degenerative condition not related to the accident. Additionally, Geico pointed to prior back problems suffered by Mr. Smith, questioned the necessity of some of the surgeries and procedures that Mr. Smith had incurred, and cast doubt on whether Mr. Smith was in as much pain as he claimed. The issues of causation and damages both were closely contested.
During the pendency of the action below, Mr. Smith settled with the driver of the other vehicle and voluntarily dismissed the action against him. The action against Geico proceeded to jury trial, and the jury returned a verdict in Mr. Smith’s favor for $20,000 in past medical expenses but also found that Mr. Smith had not incurred a permanent injury as a result of the accident and was not entitled to any future medical expenses. Mr. Smith now appeals the final judgment based on the jury’s verdict.
On appeal, Mr. Smith first argues that the trial court erred in allowing Geico to present to the jury videos taken by surveillance cameras located within the bus. These were time-lapse videos that showed only four to five frames per second as opposed to real time videos, which the parties agreed below typically show twenty-nine to thirty frames per second. In opening statement, counsel for Geico indicated that the jury would “get to actually see the accident occur because the accident was recorded on bus videotapes.... And you’ll get to see what happened to Mr. Smith in the bus.” Counsel for Geico further stated that Geico’s expert witness, an accident reconstructionist, had viewed the videos and would use them to testify as to the speed at which the bus was traveling and the distance the bus traveled during the accident. In objecting to the introduction of the videos, Mr. Smith first stipulated to the speed and distance traveled as determined by Geico’s expert. He then argued that the videos were not fair and accurate representations of what occurred on the bus and that the probative value of the videos was outweighed by the possibility that they would mislead the jury because they did not “catch the entire motion of Mr. Smith. It catches him at certain points. We don’t know what happened in the other frames.” The trial court overruled Mr. Smith’s objection and allowed the time-lapse videos to be shown to the jury.
*811 Mr. Smith maintains on appeal that this was error because the images on the time-lapse videos did not contain all that happened during the incident. Mr. Smith argues that Geico’s experts were able to mislead the jury by suggesting that Mr. Smith did not hit the seat in front of him during the accident as he had testified. Mr. Smith asserts that the videos were not a fair and accurate representation of what happened in the bus during the incident.
A videotape, like a still photograph may be admissible, “if relevant to any issue required to be proven in a case,” State v. Wright, 265 So.2d 361, 362 (Fla.1972), “unless it is barred by a rule of exclusion or its admission fails a balancing test to determine whether the probative value is outweighed by its prejudicial effect.” Rose v. State, 787 So.2d 786, 794 (Fla. 2001).
Bryant v. State, 810 So.2d 532, 535 (Fla. 1st DCA 2002). “The proponent of a [videotape] must be prepared to establish as a predicate for its admission that the [videotape] fairly and accurately represents what it purports to depict.” Id. at 536. Furthermore, the time-lapse nature of a video does not make the video per se inadmissible. See generally Jefferson v. State, 818 So.2d 565, 566 (Fla. 1st DCA 2002) (“Each case in which a time[-]lapse videotape or a copy thereof has been received in evidence over objection supports affirming here. Cases in which no objection to such tapes was noted also support the view that time[-]lapse videotapes are not automatically excludable.” (citations omitted)).
Here, Mr. Smith stipulated that the videos were from the bus on the day in question.[1] As such, we cannot say that the trial court abused its discretion in determining that the videos were a fair and accurate representation of what occurred on the bus that day. See Bryant, 810 So.2d at 536 (noting that if no witness is available to testify as to the accuracy of a video or photograph, a trial court can base a finding that the evidence “ ‘is a fair and accurate representation of a material fact,’” on “foundational facts establishing the reliability of the process that yielded the photographic images” (quoting Charles W. Ehrhardt, Florida Evidence, § 401.2, at 114 (2001 Ed.))); see also Bowles v. State, 979 So.2d 182, 194 (Fla.2008) (“Admission of photographs is a matter for the discretion of the trial court, and this [c]ourt has held it will not disturb such rulings absent a clear abuse of discretion.”).
We likewise cannot say that the trial court abused its discretion in rejecting Mr. Smith’s section 90.403, Florida Statutes, argument that the videos’ probative value is substantially outweighed by the danger that they might unfairly mislead the jury due to their time-lapse nature. As the trial court pointed out in its ruling, there would be nothing prejudicial about introducing still photographs taken from the videos. Still shots would also be accurate representations of what occurred on the bus. The time-lapse videos essentially consist of four to five still photographs per second shown in rapid succession. And also as the trial court pointed out, Mr. Smith was free to — and did— cross-examine the expert regarding the time-lapse nature of the videos and the fact that real time would include another twenty-four to twenty-six frames per second. As such, Mr. Smith’s arguments go to the weight that should be given the evidence, not the admissibility of the evidence. We see no error in the trial court’s admitting the time-lapse videos in to evidence.
*812 Mr. Smith’s second argument on appeal pertains to the letters of protection that his attorney sent to his several treating physicians.[2] At trial, counsel for Geico first mentioned the letters of protection in opening statement by suggesting that the individual doctors each had a financial interest in the lawsuit. Counsel stated: “You will hear ... that Chiropractor Thorpe was treating Mr. Smith under a letter of protection. The letter of protection essentially says, I’ll treat you for free, pay me back out of your lawsuit. Chiropractor Thorpe’s financial interest in this lawsuit is about $6500.” This type of statement was repeated regarding each of Mr. Smith’s physicians.
In response, during direct examination of Mr. Smith’s first witness, Dr. Paul Zak, M.D., counsel asked the doctor to describe the letter of protection he received from Mr. Smith. The doctor responded that although Mr. Smith was still responsible for the bill, payment would be deferred until the claim against the insurance company was completed. The conversation concluded with the following exchange:
Q: All right. That is my point. If the insurance company doesn’t pay, do you just forget about the bill?
A: No, we still ask the patient to find a way to pay the bill.
On cross-examination, counsel for Geico showed a portion of the letter of protection on an overhead projector and asked Dr. Zak if he had agreed to the following language in the letter: “The client and the provider agree that in the event the Settlement, Verdict, or Judgment are reduced, compromised or modified and if the client does not receive full value for their [sic] claim the provider shall also reduce its bill proportionately to the client’s reduced recovery.” Dr. Zak confirmed that he had agreed to that provision in the letter of protection he received from Mr. Smith. When counsel inquired of Dr. Zak as to the discrepancy between his earlier statement that Mr. Smith would be held responsible for the bill and the language agreeing to a reduction of the bill, counsel for Mr. Smith objected, arguing that the question brought up an inadmissible collateral source, was irrelevant, and provided a way for Geico to escape liability for the damages Mr. Smith incurred.
Counsel for Geico suggested that Mr. Smith’s counsel had opened the door on direct examination by giving the impression that if Mr. Smith obtained a judgment less than the amount of medical bills, he would be held personally responsible for the difference. Geico argued that this was not an accurate impression and that it had the right to show that Mr. Smith’s financial obligations would be reduced proportionately based on the value of his recovery. Counsel also argued that the issue of Dr. Zak’s personal financial interest in the outcome of the case was proper witness impeachment. The trial court overruled Mr. Smith’s objection, and Geico’s counsel went on to ask similar questions of Dr. Hassan, again over Mr. Smith’s objections. After the jury returned a verdict for Geico, *813 Mr. Smith moved for a new trial, but the trial court denied the motion.
Mr. Smith argued below, and argues now on appeal, that introduction into evidence of this language in the letters of protection could lead the jury to compromise its liability verdict by thinking that if Mr. Smith obtained a limited award — or no award at all — he would not be prejudiced because his doctors agreed to take a reduced fee proportionate to the award of damages stated in the verdict. Mr. Smith maintains that this evidence amounted to collateral source evidence, which is per se inadmissible. We do not agree.
Under the common law, collateral source evidence was per se inadmissible and the payments from such sources were not used to offset the tortfeasor’s liability. Goble v. Frohman, 848 So.2d 406, 408 (Fla. 2d DCA 2003). However, the Florida Legislature modified the portion of the rule related to damages by enacting section 768.76, Florida Statutes. By this provision, the payments made to or on behalf of an injured party by a collateral source are to be offset against the damage awarded to an injured party by verdict or settlement. § 768.76(1), Fla. Stat. (2011) (“[T]he court shall reduce the amount of such award by the total of all amounts which have been paid for the benefit of the claimant, or which are otherwise available to the claimant, from all collateral sources.”). But “[t]he collateral source rule functions as both a rule of damages and a rule of evidence.” Gormley v. GTE Prods. Corp., 587 So.2d 455, 457 (Fla.1991). And the evidentiary application of the collateral source rule has remained unchanged.
[Collateral source evidence misleads the jury on the issue of Lability and, thus, subverts the jury process. Because a jury’s fair assessment of liability is fundamental to justice, its verdict on liability must be free from doubt, based on conviction, and not a function of compromise. Evidence of collateral source benefits may lead the jury to believe that the plaintiff is “trying to obtain a double or triple payment for one injury,” Clark [v. Tampa Elec. Co.], 416 So.2d 475, 476 [(Fla. 2d DCA 1982) ], or to believe that compensation already received is “sufficient recompense.” Kreitz v. Thomas, 422 So.2d [1051,] 1052 [(Fla. 4th DCA 1982) ].
Id. at 458.
The reduction-of-fee agreements included in the letters of protection at issue here do not involve a payment by a third party. The doctors’ fees will only be established after the jury determines the damages. The collateral source rule specifically relates to the offsetting of damages, but there is no offset to be paid here. Accord: ingly, the instant agreements do not meet the definition of a collateral source.
We agree that the evidence might lead to the same prejudice that collateral source evidence can cause. But the way to remedy that problem is by weighing the potential prejudice against the evidence’s probative value as called for in section 90.403, not by per se excluding the evidence as violative of the collateral source rule. Mr. Smith, however, did not make a section 90.403 challenge to this evidence below or on appeal, and thus we cannot consider such prejudice in our disposition of this appeal. See Pagan v. Sarasota Cnty. Pub. Hosp. Bd., 884 So.2d 257, 271 (“‘[A]n appellate court will not consider any ground for objection not presented to the trial court; review is limited to the specific grounds raised below.’ ” (alteration in original) (quoting Clock v. Clock, 649 So.2d 312, 315 (Fla. 3d DCA 1995))).
Having determined that the letters of protection are not evidence of a collateral source, we conclude that the trial court did *814 not abuse its discretion in allowing Geico to question Mr. Smith’s treating doctors about their reduction-of-fee agreements. See Pelham v. Walker, — So.3d -, -, 2013 WL 5225340, *3 (Fla. 2d DCA Sept. 18, 2013) (“We review the trial court’s evidentiary rulings for an abuse of discretion.”).
Because Mr. Smith has not established reversible error, we affirm the trial court’s final judgment.
ALTENBERND and CASANUEVA, JJ., Concur.

. Counsel for Mr. Smith specifically stated: "[P]laintiff doesn't dispute this is an unadulterated version of the video that was on the bus.”

. " 'A letter of protection is a document sent by an attorney on a client’s behalf to a healthcare provider when the client needs medical treatment[ ] but does not have insurance. Generally, the letter states that the client is involved in a court case and seeks an agreement from the medical provider to treat the client in exchange for deferred payment of the provider’s bill from the proceeds of [a] settlement or award[,] and typically if the client does not obtain a favorable recovery, the client is still liable to pay the providers' bills.’ Caroline C. Pace, Tort Recovery for Medicare Beneficiaries: Procedures, Pitfalls and Potential Values, 49 Hous. Law. 24, 27 (2012).” Carnival Corp. v. Jimenez, 112 So.3d 513, 517 n. 3 (Fla. 2d DCA 2013).